## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| CHERYL JANKY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | NO. 2:07-CV-339 PPS APR |
| SPEROS BATISTATOS, LAKE COUNTY | ) | |
| CONVENTION & VISITORS BUREAU, | ) | |
| and its BOARD OF DIRECTORS, | ) | |
| Individually, Jointly, and Severally and | ) | |
| ATTORNEYS TIMOTHY JORDAN, | ) | |
| ROBERT GOLDSTEIN, DANIEL | ) | |
| KUZMAN and Agents known and unknown, | ) | |
| JOHN DOES, Jointly and Severally, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### OPINION AND ORDER

This is one of those cases that gives lawyers a bad name.  It began as a routine copyright infringement dispute but has deteriorated into a nuclear arms race of costly litigation tactics and the worst kind of mean spirited attorney game-playing.  It has spawned two federal cases, three appeals, one state case, a judicial recusal and multiple instances of court-imposed sanctions.  Some of the low lights include the filing of spurious motions and a letter from one party to another containing bad poetry composed by one of the lawyers. [DE 22-8].

The dispute began when Plaintiff Cheryl Janky filed suit against Defendants Henry Farag, Street Gold Records, and the Lake County Convention & Visitors Bureau (LCCVB) over the rightful use and ownership of a song written by Janky titled "Wonders of Indiana."   Recently, the parties appeared to be on the verge of settlement.  Sadly, matters deteriorated once more, and as a

result, Janky has rushed back to court hoping to use the Court's power as an instrument to exact

what she wants from her opponent.  In particular, Janky seeks enforcement of the terms listed in a

December 2, 2008 email as a binding settlement agreement between Janky and the Defendants.

Because Janky has failed to show the requisite offer and acceptance, or that a meeting of the minds

has occurred between the parties on all essential terms of the purported contract, I must deny her

motion.

**BACKGROUND**

**1.**      **Procedural History**

Although it's rather tedious, some procedural history is necessary to fully comprehend the

breadth of this dispute and to provide an understanding of the circumstances surrounding the

parties' latest quarrel.  Janky commenced her first lawsuit against LCCVB, Farag, and Street Gold

Records over the Wonders of Indiana copyright dispute on October 3, 2003.  (Case No. 3:05-CV-

217, DE 1.) The complaint alleged that Farag, the owner of Street Gold Records and Janky's one-

time band-mate, licensed and sold the rights to Wonders of Indiana to LCCVB without Janky's

knowledge. (*Id.* at ¶ 16.)  Janky also alleged that LCCVB improperly used the song in its

promotional videos and sold it as part of a "Doo-Wop" album it sold in its Welcome Center.  (*Id.* at

¶ 20.)

The case was initially filed in the Eastern District of Michigan.  It was transferred here but

not without Magistrate Judge Cherry levying sanctions against Janky for unreasonably maintaining

her position that personal jurisdiction of LCCVB was proper in Michigan.  (Case No. 3:05-CV-

217, DE 149.) Later, Judge Cherry sanctioned Janky's attorney, Gregory Reed, pursuant to Rule

37(c) for filing a Motion for Impoundment and Injunctive Relief against LCCVB based on

2

allegations that "did not have nor were likely to have evidentiary support." (Case No. 3:05-CV-217, DE 187 at 9-10.)  LCCVB has not yet seen that money, owing to Janky's appeal of Judge Cherry's decision on the issue and Mr. Reed's ten-month delay in even satisfying the Rule 62 bond requirement for staying on appeal the enforcement of a sanction order. (Case No. 3:05-CV-217, DE 340).

On another occasion, sanctions were once again levied, this time by Judge Rodovich against all three of Janky's attorneys – Gregory Reed, Stephanie Hammonds and Francois Nabwangu – for filing a motion to disqualify Judge Cherry under 28 U.S.C. 455, a motion which was filed *after* Judge Cherry had already recused himself from the case.[1]  (Case No. 3:05-CV-217, DE 149.) While attorneys Reed and Hammonds paid these sanctions in a timely fashion, Mr. Nabwangu did not, and was sanctioned an additional $100.00 per day beginning August 16, 2007 until he paid the outstanding amounts. (Case No. 3:05-CV-217, DE 149.)  There is no record that attorney Nabwangu has paid the sums owed for his sanctions.[2]

At some point in the midst of all of these sanctions, a trial occurred in which Janky prevailed.  On March 16, 2007 the jury awarded her $100,000 for LCCVB's copyright

---

[1]Judge Cherry recused himself after determining that he would be a witness to an evidentiary dispute relevant to LCCVB's April 2, 2007 Motion for Attorney Fees.  (Case No. 3:05-CV-217, DE 280.)  In that motion, LCCVB alleged that during a settlement conference held by Judge Cherry on March 15, 2007, without attorneys present, Ms. Janky revealed that her attorneys had failed to communicate various pre-trial settlement offers which might have caused the litigation to be settled prior to trial. (*Id.*)

[2]Mr. Nabwangu signed the complaint for the matter presently before this court. (Case No. 2:07-CV-339, DE 1 at 8.)  He did not, however, file a motion to appear *Pro Hac Vice*.  The Court, noting this procedural error and Mr. Nabwangu's failure to pay his outstanding fines, ordered his name removed from the docket. (*Id.*, DE 16.)

infringement of the Wonders of Indiana song.  (Case No. 3:05-CV-217, DE 229.) [3]  Battles quickly ensued after the verdict over motions filed by both parties seeking reconsideration and amendment of the judgment. (Case No. 3:05-CV-217, DE 292.)  Additional disputes arose over the payment of sanctions and whether they should be set-off against the $100,000 damage award. (*Id*.)  Judge Rodovich ordered the amount reduced to $87,701.50 to reflect the amount set-off for sanctions incurred by Janky relating to her improper jurisdictional arguments, but denied Janky's motion to have attorney Reed's sanctions set-off against his client's damage award. (*Id*.)

The onslaught of appeals began on June 7, 2007, with LCCVB appealing the denial of its motion for new trial because of allegedly excessive damages.  (Case No. 3:05-CV-217, DE 282.) On July 19, 2007, Janky appealed the court's decision to have Reed pay his own sanctions.  (Case No. 3:05-CV-217, DE 305.)  On March 7, 2008, LCCVB appealed the denial of its motion for fees and costs – LCCVB contended that Janky's attorneys had never notified her of previous settlement offers and thereby wastefully extended the litigation.  (Case No. 3:05-CV-217, DE 362.)   The decision denying LCCVB's motion for fees also denied Janky's own fee request, in which Janky argued that LCCVB's fee request was frivolous.  Judge Rodovich appropriately described Janky's motion as being made in "the circular manner that has come to characterize this case." (Case No. 3:05-CV-217, DE 361 at 6.)

Aside from the original litigation and three appeals mentioned above, Janky also filed a state court claim in Lake County Circuit Court, Crown Point, Indiana.  (Case No. 45C01-0609-PL-400.)  Although Farag and Gold Street Records were dismissed with prejudice from the first

---

[3]  Prior to the trial, the Court had entered an order staying proceedings as to Defendants Farag and Street Gold Records, and ultimately dismissed the Complaint against them with prejudice on March 20, 2007.   (Case No. 3:05-CV-217, DE 241).

federal case, they remain a party in the state case. *See* Def. Br. at 7. (Case No. 3:05-CV-217, DE 88.)

After receiving her verdict in federal court, and while appeals were already pending in that case, Janky filed yet another federal complaint – this case – in the Northern District of Indiana. (Case No. 2:07-CV-339, DE 1.)  This newest (and shortly thereafter amended) complaint named not only the LCCVB as a defendant, but also the LCCVB board of directors in their individual capacities; the CEO of LCCVB – Speros Batistatos; and the LCCVB's attorneys – Timothy Jordan, Robert Goldstein, and Daniel Kuzman.   (Case No. 2:07-CV-339, DE 1; DE 11.)  Janky now alleges that these defendants committed the tort of Abuse of Process by asserting that Janky did not own the Wonders of Indiana song as a defense in the earlier case.   (Case No. 2:07-CV-339, DE 11 at ¶ 21.) The complaint tacks on counts alleging violations of the Fifth Amendment and Section 1983, as well as a negligence claim. (*Id*. at ¶¶ 29-45.)  It was this complaint that brought the parties before me.

### 2.      Dispute Over Settlement

In the current federal suit, the defendants moved to dismiss and requested sanctions against the plaintiffs.  Before I could rule on those motions, I was informed by the parties that they were close to settlement and wished to stay all deadlines.  Behind the scenes, however, matters were apparently breaking down.  Here's what happened: on November 20, 2007 Janky's lawyer sent defendants' attorney Robert Goldstein an email with the following settlement terms:

1.      Plaintiff will withdraw federal complaint captioned Janky v. Batistatos et al,
        Case No: 2:07-cv-00339-PPS-APR.

2.      Plaintiff will withdraw her state court complaint entitled Janky v. Batistatos et
        al. Circuit Court Cause No. 45C01-0609-PL-00400.

5

3.      Lake County Convention and Visitors Bureau with [sic] withdraw its appeal entitled, Janky v. Lake County Convention & Visitors Bureau U.S. Court of Appeals Seventh Circuit docket #: 07-2350.

4.      Plaintiff will withdraw her appeal entitled Janky v. Lake County Convention & Visitors Bureau U.S. Court of Appeals Seventh Circuit docket # 07-2762.

5.      All parties will be responsible for their own attorney fees.

(Case No. 2:07-CV-339, DE 26-2).  Mr. Goldstein, representing the defendants in this the second

Federal case  ("Janky II Defendants"), responded with the now disputed December 2 email.  The

email in question said:

Dear Ms. Hammonds:

I have discussed your offer of settlement with my clients.  My clients have authorized me to *accept* the offer which is:

1.      You will dismiss the State Janky matter with prejudice.

2.      In the first Federal Janky matter, Lake County will dismiss its appeal of the jury verdict to the 7th circuit with prejudice, and Janky will likewise dismiss her appeal with prejudice.  Also, Janky will provide a satisfaction of judgment.

3.      In the Second Janky matter, with the pending 12(b)(6) motion and safe harbor letter, Janky will dismiss the case with prejudice.

4.      The parties will be solely responsible for their attorney fees.

5.      Although not explicitly mentioned in your proposal, the parties will enter into a mutual global release.  We will provide the initial proposed release language in the near future.

Please prepare the appropriate proposed stipulations to dismiss, in conformance with the settlement, the State Janky matter, Janky's appeal in the first Federal Janky matter, and the second Federal Janky matter.  Please provide those stipulations to me for review.  I will provide you a proposed stipulation dismissing Lake County's 7th circuit appeal and a proposed satisfaction of judgment.

Tomorrow, I will be in court and traveling the rest of the day, although at times I will have access to my email.  Please include Mr. Jordan on any e-mail in the event

6

I am not able to respond.  Thank you. rdg

(*Id*.) (emphasis in original).  Both the November 20, 2007 email and the December 2 email call for

the dismissal of the four outstanding cases.  The main difference between the two is the fifth term

listed in the December 2 email; a proposal that the parties enter into a mutual global release with

language to be developed at a later time.

The negotiation over the mutual global release is where matters began to break down.  The

Janky II Defendants sent Janky a draft on January 22, 2008.  The draft was loaded with terms that,

unsurprisingly, were not to Janky's liking.  It included:

- That Janky post a $100,000 bond to secure against future claims against the Janky II Defendants;

- That Janky issue a press release admitting she was in error for pursuing the lawsuits;

- That Janky convey ownership of the disputed song, "Wonders of Indiana" to the Janky II Defendants; and

- That Janky pay all court ordered sanctions;

(Case No. 2:07-CV-339, DE 22-6.)  The proposed release also included terms relating to Defendant

Farag.  These included:

- Farag shall transfer any ownership rights to LCCVB; and

- Farag will provide the LCCVB and its Board of Directors with a license to his right of publicity as it relates to the Wonders of Indiana song.

(*Id*.) Importantly, there is no indication that Farag has communicated any sort of response to the

December 2 email or the Janky II Defendants' January 22, 2008 mutual global release draft. The

evidence is actually to the contrary.  Defendants indicate, and Janky does not dispute, that Farag

and Street Gold Records, still named as defendants in the state action, have rejected any form of

settlement. (*Id.*, DE 27 at 3.)

Janky and the Janky II Defendants continued to exchange drafts of the mutual global release, but could not come to agree on terms.  On February 15, 2008, Janky filed her Motion for Enforcement of Settlement Agreement.  (Case No. 2:07-CV-339, DE 23.)  On the same day, she filed a Motion to Stay Proceedings.  (*Id.*, DE 23.)  In the meantime, Janky has had over 100 days to respond to the Janky II Defendants' Motion to Dismiss, but her deadline has been delayed first after she requested an extension to consider a voluntary dismissal and second after the Court was notified that the parties were close to settlement.

## DISCUSSION

An agreement to settle claims in a federal court is enforceable "just like any other contract."  *See Dillard v. Starcon Int'l, Inc.*, 483 F.3d 502, 506 (7th Cir. 2007) (quoting *Lynch, Inc. v. SamataMason Inc.*, 279 F.3d 487, 489 (7th Cir. 2002)).  *See also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380-82 (1994).  State law governs whether a contract to settle the case was made. *Dillard*, 483 F.3d at 506.  The parties agree that Indiana law applies here.

Under Indiana law, an agreement to settle a lawsuit is generally enforceable.  *See, e.g.*, *Zimmerman v. McColley*, 826 N.E.2d 71 (Ind. Ct. App. 2005) (enforcing oral settlement agreement regarding an automobile accident). "A meeting of the minds of the contracting parties, having the same intent, is essential to the formation of a contract."  *Id.* at 77.   "Settlement agreements are governed by the same general principles of contract law as any other agreement," and thus "[a]n offer, acceptance, plus consideration make up the basis for a contract."  *Id.* at 76.  *See also Pohl v. United Airlines, Inc.*, 110 F. Supp. 2d 829, 837 (S.D. Ind. 1999).

The December 2 email is not an enforceable contract because the parties did not meet the

black-letter requirements of offer and acceptance.  Janky's November 20 email proposed the

dismissal of the outstanding state and federal suits and appeals, and that each party would be

responsible for its own attorneys' fees.  The Defendants subsequent December 2 email proposed

terms that were similar in part and different in other respects from Janky's initial offer.  It listed the

dismissal of outstanding cases and the parties' bearing of their own fees as potential terms, but,

significantly, added that the parties would enter into a "mutual global release."

Although Attorney Goldstein said that he "accepted" Janky's offer, he proceeded to add

additional terms so his "acceptance" was nullified.  This is because an acceptance which varies

from the offer is not an acceptance at all, but instead is considered a counteroffer.  *See Martinez v.*

*Belmonte*, 765 N.E. 2d 180, 183 (Ind. Ct. App. 2002); *Uniroyal, Inc. v. Chambers Gasket and Mfg.*

*Co.*, 380 N.E.2d 571, 575 (Ind. Ct. App. 1978);  *Wittman v. Duning*, 2007 WL 155856, *2 (Ind. Ct.

App. May 31, 2007).  In Goldstein's December 2 email, the variance from the initial offer was

specifically highlighted, as he prefaced the new term with the language, "[a]lthough not explicitly

mentioned in your proposal . . .," thus putting Janky on notice that there was a deviation from the

first offer.  "It is well settled that in order for an offer and an acceptance to constitute a contract,

the acceptance must meet and correspond with the offer in every respect."  *Martinez*, 765 at 183.

This "mirror image rule" renders Goldstein's December 2 email a counteroffer, one which was

never accepted by Janky over the course of subsequent negotiations.  Without an acceptance, there

is no contract.

While the mirror-image rule may strike some parties as overly-formulistic, Indiana does

adhere to its strict enforcement.  Were this a UCC matter, the outcome might be different.   Section

2-207 of Indiana's version of the UCC was "specifically designed to alter the common-law

9

'mirror-image' rule." *Uniroyal,* 380 N.E.2d at 322.  It was the very fact that the mirror-image rule

required an exact match between offer and acceptance that motivated the UCC's draftsmen to

come up with a more lenient rule.  *See Continental Grain Co. v. Followell*, 475 N.E. 2d 318, 322

(Ind. Ct. App. 1978) ("Section 2-207 abandons the mirror image rule that an acceptance must

coincide exactly with all terms of an offer."); *see also*, *Architectural Metal Systems, Inc.*, 58 F.3d

1227, 1230 (7th Cir. 1995) (comparing mirror-image rule to UCC and noting, that "[u]nder the

UCC, the fact that the acceptance contains different terms from the offer does not convert the

acceptance into an offer or otherwise make it ineffective as an acceptance.")  By contrasting it to

the UCC section, these cases highlight the rigidity that the mirror-image rule requires.  This dispute

does not involve a UCC matter, and so the mirror-image rule, with all of its strictness and

formality, must be followed.  Thus, even though the Defendants wrote "accept" in the December 2

email, the inclusion of additional terms from the initial offer turns the email into a counter-offer.

*See e.g., Wittman v. Dunin*g, 2007 WL 1558586 at *2-3 (finding communication to be counter-

offer, despite the fact that it said it "incorporates option A that was presented in your letter . . .")

Even if the December 2 email could be called an acceptance, the most fitting

characterization of the document is not a settlement agreement but an agreement to agree.   "The

law is well established that a mere agreement to agree at some future time is not enforceable."

*Wolvos v. Meyer*, 668 N.E.2d 671, 674 (Ind. 1996).  The Indiana courts recognize that the

distinction between offers and preliminary negotiations can be a fine one, but that a communication

stating a first party's willingness to enter a bargain is not an offer if the second party has reason to

know that the communication was not intended to conclude a bargain without further manifestation

of the first party's assent.  *Zimmerman*, 826 N.E.2d at 77 (citing *Suyemasa v. Myers*, 420 N.E.2d

10

1334, 1344 (Ind. Ct. App. 1981)). "In examining the parties' intent at the time the agreement was

drafted, courts look to whether the parties intended to execute a subsequent written document."

*McClinden v. Coco*, 765 N.E.2d 606, 612 (Ind. Ct. App. 2002).   The Defendants' proposal

indicated that further signs of assent were necessary by demanding that the parties compose and

enter into a mutual global release.  "When one enters into an agreement with the understanding that

neither party is bound until a subsequent formal written document is executed, no enforceable

contract exists until the subsequent document is executed."  *Wolvos*, 668 N.E.2d at 675 (citing

*Foster v. United Home Improvement, Co., Inc.*, 428 N.E.2d 1351, 1355 (Ind. Ct. App. 1981)).

Janky and the Defendants never entered the mutual global release that was directly envisioned by

the December 2 email and therefore failed to create an enforceable agreement.

Nevertheless, it must be said that parties can make an enforceable contract, even if that

contract references a future and final written agreement.  *Wolvos*, 668 N.E.2d at 674.  But those

preliminary agreements only become enforceable if they express all essential terms that are to be

incorporated in the document.  *Id*.  The parties dispute whether the term calling for the mutual

global release, or the terms that were to be included in that mutual global release, are essential.

Janky writes in her brief, "[m]ost notably the release term is redundant since all of the

dismissal/stipulation incorporates releasing the claims by the cases being dismissed in it and of

themselves." Reply Mot. (DE 28) at 3.   Somewhere buried in that sentence is the argument that the

term calling for a mutual global release is redundant, and therefore not essential, because the

parties already agreed on terms calling for the dismissal of pending litigation.  But what Janky calls

"redundant" is more properly viewed as "essential" when placed in proper perspective against the

background of years of tumultuous litigation.

11

"The intention of the parties to a contract is a factual matter to be determined from all the circumstances." *Ochoa v. Ford*, 641 N.E.2d 1042, 1044 (Ind. Ct. App. 1994). The circumstances here reveal that the parties have been at each other's throats for years. The trial verdict in the first federal case did nothing to slow down the tide of fee requests, appeals, disputes over sanctions and entirely new lawsuits which named as defendants not only the original parties but their lawyers as well! If there was one thing that the Janky II Defendants would be motivated to see in a final settlement agreement, it is stone cold guarantee against Janky filing more lawsuits against them relating to the copyright violation that started this whole mess. Such terms were not in the December 2 email. Instead, the email had four bullet points, briefly summarizing the presently active cases that would be dropped, and a fifth item that indicated a mutual global release would be negotiated and drawn up in the future. That fifth item served as a placeholder for unstated terms that were expected to form the "heart of their settlement." *See Dillard* 483 F.3d 502 at 508.

Communications taking place after the December 2 email reveal proposals that Janky post a $100,000 bond to secure against future claims against Defendants and that Janky issue a press release admitting she was in error for pursuing the lawsuits. The parties disputed those and other proposed terms and never filled in the essential blanks covered up by the "mutual global release" placeholder found in the December 2 email. "The failure to demonstrate agreement on essential terms of a purported contract negates mutual assent and hence there is no contract." *Ochoa*, 641 N.E.2d at 1044. The minds of Janky and Defendants never met on the meaning of the fifth, essential term found in the December 2 email, and consequently, they did not come to an enforceable agreement.

Along with needing to state all essential terms, preliminary agreements which incorporate

12

future written agreements are only enforceable if the essential terms they do include are definite. *Wolvos*, 668 N.E.2d at 675. "The more important the uncertainty, the stronger the indication is that the parties do not intend to be bound; minor items are likely to be left to the option of one the parties or to what is customary or reasonable." *Id.* (quoting ARTHUR LINTON CORBIN AND JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 2.8 at 131 (rev. ed. 1993). Without definite terms, the Court is left without anything to enforce. Definiteness is necessary because "the contract must provide a basis for determining the existence of a breach and for giving an appropriate remedy." *McLinden v. Coco*, 765 N.E.2d 606, 613 (Ind. Ct. App. 2002).

The term "mutual global release" is not definite enough to be enforceable. *United States v. Orr Const. Co.*, 560 F.2d 765 (7th Cir. 1977) proves this point. That case addressed the similar issue of whether the term "proper legal releases" was sufficiently definite to render a settlement agreement enforceable. The Seventh Circuit held it was not, recognizing that the phrase "could have any number of meaning depending on the view of the person interpreting it." So too could the term "mutual global release," despite the fact that, as Janky points out, the dictionary provides a definition for the word "release." After all, the dictionary has a definition for the words "settlement" and "contract," but more specificity is needed in an agreement before it can be enforceable. The phrase "mutual global release" does not come close to adequately describing how the parties intended to complete the complicated task of terminating at least four separate lawsuits, each in various stages of litigation and jurisdictions. For example, what of the Defendants Farag and Street Gold Records? They were not listed on the December 2 email despite the fact that they would have to sign off on any release agreed to by Janky and LCCVB, at least if they wanted to see all the cases dismissed. Add to this the past history of bitter acrimony between the parties and

sanctionable attorney conduct, and I must conclude that the email lacked the definiteness required to address the parties' obvious concerns over continued legal battles and it therefore cannot be an enforceable contract.

Were this the only document to rely on in the event that a future dispute broke out (an event I fear I must be particularly wary of in this case), there would be nothing to guide a court by way of enforcing mutual acts and obligations or remedies for failure to perform. "The parties to a contract have the right to define their mutual rights and obligations . . . a court may not make a new contract for the parties or supply missing terms under the guise of construing a contract." *Ochoa,* 641 N.E.2d at 1044. In sum, the parties have not agreed on the details making up their mutual global release, and I will not create those details for them; they will need something more than a half-page email to disentangle this Gordian knot.

<u>**CONCLUSION**</u>

For the foregoing reasons, Janky's Motion to Enforce the Settlement Agreement (DE 22) is **DENIED**. Janky is ordered to respond to Defendants' Motion for Judgment on the Pleadings by **May 12, 2008.** Defendants' reply will be due **May 23, 2008. No further continuances will be given.**

SO ORDERED.

ENTERED: April 24 , 2008

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT

14